# In the United States Court of Appeals for the Ninth Circuit

LINDSAY HECOX, *et al.*,

*Plaintiffs–Appellees,*

v.

BRADLEY LITTLE,

in his official capacity as Governor of the State of Idaho, *et al.*,

*Defendants–Appellants,*

and

MADISON KENYON, *et al.*,

*Intervenors-Appellants*

## *AMICUS CURIAE* BRIEF OF SANDRA BUCHA, LINDA BLADE, VICKI HUBER-RUDAWSKY, INGA THOMPSON, MARIA BLOWER, AND REBECCA DUSSAULT IN SUPPORT OF THE APPELLANTS AND REVERSAL

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO
CASE NO. 1:20-CV-00184-DCN
THE HONORABLE DAVID C. NYE

EDWARD M. WENGER
119 South Monroe Street, Suite 300
Tallahassee, Florida 32301
Telephone: (850) 222-7500
Fax: (850) 224-8551
edw@hgslaw.com

*Counsel for Amicus Curiae*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................... ii

STATEMENT OF THE ISSUES............................................................................. 1

INTEREST OF AMICUS CURIAE ....................................................................... 2

INTRODUCTION & SUMMARY OF THE ARGUMENT ................................... 7

STATEMENT OF THE CASE AND FACTS......................................................... 9

ARGUMENT........................................................................................................ 14

I.     TESTOSTERONE SUPPRESSION CANNOT ELIMINATE THE INHERENT ADVANTAGE
THAT INDIVIDUALS BORN WITH MALE ANATOMY HAVE OVER CISGENDER
WOMEN. ...................................................................................................... 15

II.    FOR THESE REASONS, THE DISTRICT COURT ERRED BY CONCLUDING THAT THE
ACT HAS "NO RELATION" TO ENSURING EQUALITY FOR FEMALE ATHLETES. .. 21

CONCLUSION...................................................................................................... 26

CERTIFICATE OF COMPLIANCE .................................................................... 29

CERTIFICATE OF SERVICE ............................................................................. 30

# TABLE OF AUTHORITIES

**Cases**

*Bucha v. Illinois High School Association*,
  351 F. Supp. 69 (N.D. Ill. 1972) .......................................................... 3

*Flemming v. Nestor*,
  363 U.S. 603 (1960) ......................................................................... 26

*Forbes v. Napolitano*,
  236 F.3d 1009 (9th Cir. 2000) .......................................................... 26

*Gallinger v. Becerra*,
  898 F.3d 1012 (9th Cir. 2018). ......................................................... 26

*Kleczek v. Rhode Island Interscholastic League, Inc.*,
  612 A.2d 734 (R.I. 1992) ................................................................. 11

*Petrie v. Illinois High School Association*,
  394 N.E.2d 855 (Ill. App. Ct. 1979) ................................................. 11

*United States v. Virginia*,
  518 U.S. 515 (1996) ......................................................................... 10

**Statutes**

42 U.S.C. § 1983 ................................................................................. 12

Idaho Code § 33-6201 to -6206 ....................................................... 1, 9

Idaho Code § 33-6202 ................................................................. passim

Idaho Code § 33-6203(1) ............................................................... 9, 10

**Other Authorities**

Doriane Coleman, Martina Navratilova, and Sanya Richards-Ross, *Pass the Equality Act, but don't abandon Title IX*, WASH. POST (Apr. 29, 2019)....9, 11, 27

Doriane Lambelet Coleman, *Sex in Sport*, 80 LAW AND CONTEMP. PROBS. 63, 74 (2017) ................................................................................. 10

Emma N. Hilton and Tommy R. Lundberg, *Transgender Women in The Female Category of Sport: Is the Male Performance Advantage Removed by Testosterone Suppression?* PREPRINTS 2020. ................................................. 20

FIT CATHOLIC MOM, http://www.fitcatholicmom.com/ (last visited Nov. 19, 2020). ................................................................................................. 6

Gina Kolata, *Men, Women and Speed. 2 Words: Got Testosterone?*, N.Y. TIMES (Aug. 21, 2008) ...................................................................... 10

*IOC Executive Board Opens Second Meeting of the Year*, INT'L OLYMPIC COMM. (Mar. 3, 2020). ............................................................................. 23

*IOC to publish transgender guidelines after Tokyo Games*, ESPN OLYMPIC SPORTS (Mar. 4, 2020) .............................................................................. 23

*Landmark World Rugby transgender workshop important step towards appropriate rugby-specific policy*, WORLD RUGBY (Feb. 27, 2020).................. 16

Neel Burton, *The Battle of the Sexes*, PSYCHOLOGY TODAY (Jul. 2, 2012)............ 10

PREPRINTS, https://www.preprints.org/how_it_works. ......................................... 19

*Rugby says transgender women should not play for elite teams*, THE ASSOCIATED PRESS (Oct. 9, 2020) ........................................................................ 16

Sandra Bucha (USA), 2014 Honor Open Water Swimmer, INT'L SWIMMING HALL OF FAME, https://ishof.org/sandra-bucha-(usa).html ............................... 3

Sara Orchard, *World Rugby could ban transgender women because of safety reasons*, BBC SPORT (Jul. 20, 2020)..................................................... 17

Sean Ingle, *IOC delays new transgender guidelines after scientists fail to agree*, THE GUARDIAN (Sept. 24, 2019). ................................................... 25

THE INGA THOMPSON FOUNDATION, https://www.ingathompsonfoundation
.org/ .......................................................................................................... 5

Tommy Lundberg et al., *Muscle strength, size and composition following 12
months of gender-affirming treatment in transgender individuals: retained
advantage for the transwomen*," KAROLINKSA INSTITUTET (Sept. 26, 2019)...... 12

*Transgender Athletes Can Now Compete in Olympics Without Surgery*, THE N.Y.
TIMES (Jan. 25, 2016). ...................................................................... 26

TRANSGENDER GUIDELINE at 2, WORLD RUGBY (Oct. 9, 2020) ............17, 18, 19, 22

Valerie Thibault et al., *Women and men in sport performance: The gender gap has
not evolved since 1983*, 9 J. OF SPORTS SCI. AND MED. 214, 219 (2010) ............ 11

*World Rugby approves updated transgender participation guidelines*, WORLD
RUGBY (Sept. 20, 2020) ............................................................................16, 17

*World Rugby to review transgender policy*, REUTERS (Feb. 28, 2020) .................. 15

## STATEMENT OF THE ISSUES

The Amici adopt the Intervenor-Appellant's statement of the issues. *See* Intervenor-Appellants' Br. 2. They will, however, focus their brief on the district court's conclusion that Idaho's "Fairness in Women's Sports Act," Idaho Code § 33-6201 to -6206, has "no relationship to ensuring equality and opportunity for female athletes in Idaho." ER 74. Specifically, the brief will address the district court's conclusion that "equality in sports is *not* jeopardized by allowing transgender women . . . to compete on women's teams," so long as the transgender women[1] "suppress[] their testosterone for one year." ER 69 (emphasis in original).

---

[1] While acknowledging that use of terminology can often prove controversial, this brief adopts the convention used by the district court. *See* ER 4-6.

# INTEREST OF AMICUS CURIAE[2]

The Amici are female athletes who have competed at the peak echelon of their chosen sports and trailblazed for the opportunities to showcase their talents and hard work on a playing field equal to that of their male counterparts. And just as each individual whose name appears on this brief worked tirelessly to reach the pinnacle of her game, all have worked just as strenuously to ensure that the next generation of female athletes will benefit from their collective contribution to the world of women's sports. Their fingerprints can be found throughout the courts and in Congress, and the legacy they have gifted to the next generation of girls and women resounds each time another season commences. They include the following:

*Sandra Bucha* is a former marathon swimmer and a 2014 inductee into the International Swimming Hall of Fame. By the time she turned ten-years old, her times in the pool cemented her place as one of the Nation's best, but her Illinois high school had no girls' swim team. Based on her talent, she was allowed to *train* with the boys, but Illinois law at the time did not permit her to *compete* with the boys. For that reason, Ms. Bucha headlined a class-action lawsuit against the Illinois High School Association to ensure equal competitive opportunities for female athletes.

---

[2] No party's counsel authored this brief in whole or in part, and no party or party's counsel, or person (other than amicus or its counsel) contributed money to fund this brief's preparation or submission. All parties have consented to the filing of this brief.

Her lawsuit did not succeed, in part, because the court took "judicial notice of the fact that at the pinnacle of all sporting contests, the Olympic games, the men's times in each event are consistently better than the women's," and found "substantial credence to the fears expressed by women coaches and athletes . . . that unrestricted athletic competition between the sexes would consistently lead to male domination of interscholastic sports and actually result in a decrease in female participation in such events." *Bucha v. Ill. High Sch. Assoc.*, 351 F. Supp. 69, 74-75 (N.D. Ill. 1972). Congress, however, mooted this legal loss by enacting Title IX, which forbade sex discrimination for any school receiving federal money and led to the creation of girls' and women's teams and leagues across the United States.

After graduating with honors from Stanford University, Ms. Bucha received her Juris Doctorate from Indiana University. She now practices law in Bradenton, Florida. The International Swimming Hall of Fame notes that "[h]er accomplishments in the water and as a social justice advocate helped pave the way for thousands of girls and women to participate in sports, the acceptance of women in the male dominated sport of marathon swimming and for marathon swimming to become an Olympic sport."[3]

---

[3] Sandra Bucha (USA), 2014 Honor Open Water Swimmer, Int'l Swimming Hall of Fame, https://ishof.org/sandra-bucha-(usa).html (last visited Nov. 19, 2020).

*Dr. Linda Blade* was crowned as the Bolivian track-and-field champion as a fifteen-year-old. Title IX ensured that she could pursue higher education through a scholarship to the University of Maryland, where she earned NCAA All-American honors in heptathlon. After her storied collegiate career, Dr. Blade was awarded the Canadian Championship and competed internationally for Team Canada.

Dr. Blade earned her Ph.D. in Kinesiology (with a specialty in physical anthropology and sexual dimorphism in growing children) from Simon Fraser University, in Canada. For the past twenty-five years, she has coached athletes from fifteen different sports. Since 2014, she has served as the President of the Board of Athletics Alberta, which is the Alberta Association for Track & Field, Cross-Country, and Road Running. Since 2019, she has served as an advisor to Save Women's Sports.

*Vicki Huber-Rudawsky* began running track in high school to maintain her conditioning for field hockey but finished her prep career with five state championship titles and state records in the 800 and 1600 meters. She continued her running career at Villanova University, where she earned eight NCAA national titles and was twice named the Nation's best female collegiate track-and-field athlete. She competed in both the 1988 and 1996 Summer Olympic Games. Since concluding her sterling career, Ms. Huber-Rudawsky has focused her attention on coaching mid-distance runners at the high-school level.

*Inga Thompson*, an elite cyclist, has competed as an Olympian three times (in 1984, 1988 and 1992). She was also crowned the National Cycling Champion on ten separate occasions and twice finished on the podium at the Women's Tour de France. Since concluding her competitive career, she has founded the Inga Thompson Foundation, a Section 501(c)(3) non-profit organization "that supports competitive women cyclists through meaningful financial assistance, mentorship and promotion of ethical, drug-free competition in all sports."[4] Her belief "that women should have the same opportunities to succeed in competitive cycling as do men today" has fortified her "mission . . . to support dedicated female athletes who would otherwise fall through the cracks of this system, promote women's cycling through social and public media channels and help women to achieve their athletic goals."[5]

*Maria Blower*, another elite cyclist, competed both nationally and internationally for Great Britain. In 1984, she represented her Country in the Olympic Games, and she did so again in 1988. She is also a former United Kingdom National Champion.

*Rebecca Dussault* began cross-country ski racing at age nine and, by the time she was seventeen, had accumulated numerous national accolades and had begun

---

[4] THE INGA THOMPSON FOUNDATION, https://www.ingathompsonfoundation.org/ (last visited Nov. 19, 2020).

[5] *Id.*

competing internationally. After a three-year respite from competitive skiing, she reentered the fray and, after only three-years back, earned a spot at the 2006 Winter Olympics. She retired from competitive skiing as a seven-time Junior National Champion and an eight-time National Champion. She now focuses her time on her family (she is a mother of six) and her professional vocation: Fit Catholic Mom.[6]

---

[6] FIT CATHOLIC MOM, http://www.fitcatholicmom.com/ (last visited Nov. 19, 2020).

## INTRODUCTION & SUMMARY OF THE ARGUMENT

The Amici know what it means to struggle for equality; their own battles are well documented and rightly celebrated. They also understand that the challenges facing the transgender community in general and transgender athletes in particular are unique, and uniquely complex. The deliberations throughout the courts, and the machinations of the court of public opinion, bear out this complexity in stark detail. Indeed, when the law at the heart of this case was percolating through the Idaho Legislature, several hundred athletes spoke out in support of it, while several hundred more spoke out against it.

Although complex issues often prompt strong feelings and stronger responses, just resolution of such issues requires something more. Specifically, fealty to objective facts, and the necessary conclusions which flow from those facts by sound application of reason, are the indispensable ingredients for determining the right outcome. And given their combined decades of competing alongside (and sometimes against) their male counterparts, the Amici are uniquely qualified to offer the following objective premises for this Court's consideration:

*First*, people born with male anatomy will have an inherent and generally insurmountable advantage over people born with female anatomy. *Second*, this advantage does not vanish when a person born with male anatomy identifies as a woman. And *third*, this advantage cannot be erased by testosterone suppression. It

follows, then, that disallowing those born with male anatomy (*i.e.*, transgender women) from participating in women's sports, even if those individuals suppress their testosterone levels, helps ensure that the playing field in female athletics remains level. This is a conclusion that the district court mistakenly rejected, and this is the conclusion that the Amici ask this Court to revisit.

To be certain, the Amici soundly reject the district court's notion that the lines drawn by Idaho's Fairness in Women's Sports Act serve only to exclude the transgender community from athletic participation. Female athletes have known what it is like to be excluded from the sports they love, and the respective careers of the Amici, both on the field and off it, demonstrate their commitment to fair inclusion. They harbor absolutely no ill will towards the transgender community, especially those who have worked hard to become accomplished athletes.

But when questions of athlete safety, objective competitive fairness, and the equality of opportunity guaranteed by Title IX arise, the Court must ground its analysis in the objective fact that transgender women retain an insurmountable athletic advantage over cisgender women. The Amici know that it is possible to "support transgender women and girls and their right to equality" while "recogniz[ing] their personal struggle" without making "the unnecessary and ironic

mistake of sacrificing the enormously valuable social good that is female sports."[7] The Court has the chance to do so here by reversing the district court's entry of a preliminary injunction, and the Amici respectfully request that it act on this opportunity.

## STATEMENT OF THE CASE AND FACTS

**A.** On March 30, 2020, Idaho Governor Bradley Little signed into law the "Fairness in Women's Sports Act" (the "Act"). *See* Idaho Code. §§ 33-6201 to -6206. The Act provides that all sports teams at Idaho primary schools, secondary schools, colleges, and universities must fall into one of three categories: "(a) [m]ales, men, or boys; (b) [f]emales, women, or girls; or (c) [c]oed or mixed." *Id.* § 33-6203(1). "[T]eams or sports designated for females, women, or girls" are "not . . . open to students of the male sex." *Id.* § 33-6203(2). The Act clarifies that "sex" for purposes of the Act is can be verified by "reproductive anatomy, genetic makeup, or *normal endogenously produced* testosterone levels," *id.* § 33-6203(3) (emphasis added). By defining biological sex by a person's "normal endogenously produced testosterone levels," *id.*, the Act prohibits transgender women who have *artificially* suppressed their testosterone levels from competing on teams or in sports

---

[7] Doriane Coleman, Martina Navratilova, and Sanya Richards-Ross, *Pass the Equality Act, but don't abandon Title IX*, WASH. POST (Apr. 29, 2019), *available at* https://www.washingtonpost.com/opinions/pass-the-equality-act-but-dont-abandon -title-ix/2019/04/29/2dae7e58-65ed-11e9-a1b6-b29b90efa879_story.html.

limited to "[f]emales, women, or girls," *id*. § 33-6203(1).

The Idaho Legislature passed the Act on the basis of the "'inherent differences between men and women'" that "'remain cause for celebration.'" *Id.* § 33-6202(1) (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)). It explained that "these 'inherent differences" include "chromosomal," "hormonal," and "physiological" variances that cause men "generally" to "have 'denser, stronger bones, tendons, and ligaments' and 'larger hearts, greater lung volume per body mass, a higher red blood cell count, and higher haemoglobin,'"[8] It also noted that men "have higher natural levels of testosterone," which translates into "'higher speed and power during physical activity.'"[9]

Next, the Idaho Legislature recounted Justice Ruth Bader Ginsburg's statement that "'sex classifications may be used to compensate women for particular . . . disabilities [they have] suffered, to promote equal employment opportunity, [and] to advance full development of the talent and capacities of our Nation's people.'" *Id.* § 33-6202(6) (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)). And given "the inherent, physiological differences between males and

---

[8] Idaho Code. § 33-6202(2)-(3) (quoting Neel Burton, *The Battle of the Sexes*, PSYCH. TODAY (Jul. 2, 2012)).

[9] *Id.* § 33-6202(3) (quoting Doriane Lambelet Coleman, *Sex in Sport*, 80 LAW AND CONTEMP. PROBS. 63, 74 (2017) (quoting, in turn, Gina Kolata, *Men, Women and Speed. 2 Words: Got Testosterone?*, N.Y. TIMES (Aug. 21, 2008))).

females" that, as recognized by courts[10] and scientific literature[11] alike, "result in different athletic capabilities," the Idaho Legislature concluded that "[h]aving separate sex-specific teams furthers efforts to promote sex equality" by providing "opportunities for female athletes to demonstrate their skill, strength, and athletic abilities" on a level playing field, as well as "opportunities to obtain recognition and accolades, college scholarships, and the numerous other long-term benefits that flow from success in athletic endeavors." Idaho Code. § 33-6202(12).

---

[10] *Id.* § 33-6202(8) (citing *Kleczek v. R.I. Interscholastic League, Inc.*, 612 A.2d 734, 738 (R.I. 1992) ("Because of innate physiological differences, boys and girls are not similarly situated as they enter athletic competition."); *Petrie v. Ill. High Sch. Ass'n*, 394 N.E.2d 855, 861 (Ill. App. Ct. 1979) (noting that "high school boys [generally possess physiological advantages over] their girl counterparts" and that those advantages give them an unfair lead over girls in some sports like "high school track")).

[11] *Id.* § 33-6202(9) ("A recent study of female and male Olympic performances since 1983 found that, although athletes from both sexes improved over the time span, the 'gender gap' between female and male performances remained stable. 'These suggest that women's performances at the high level will never match those of men.' Valerie Thibault et al., *Women and men in sport performance: The gender gap has not evolved since 1983*, 9 J. OF SPORTS SCI. AND MED. 214, 219 (2010). As Duke Law professor and All-American track athlete Doriane Coleman, tennis champion Martina Navratilova, and Olympic track gold medalist Sanya Richards-Ross recently wrote: 'The evidence is unequivocal that starting in puberty, in every sport except sailing, shooting, and riding, there will always be significant numbers of boys and men who would beat the best girls and women in head-to-head competition. Claims to the contrary are simply a denial of science,' Doriane Coleman, Martina Navratilova, and Sanya Richards-Ross, *Pass the Equality Act, but don't abandon Title IX*, WASH. POST (Apr. 29, 2019)").

At the heart of this case is the Idaho Legislature's conclusion that the physical advantages "that natural testosterone provides to male athletes is *not* diminished through the use of puberty blockers and cross-sex hormones." *Id.* § 33-6202(11) (emphasis added). For that reason, an athlete may not rely on *artificially* suppressed testosterone levels to fall under the Act's definition of "biological" female. In support of this restriction, the Legislature cited a "recent study" regarding "the impact of" hormone suppression, which "found that even 'after 12 months of hormonal therapy,' a man who identifies as a woman and is taking cross-sex hormones 'had an absolute advantage' over female athletes and 'will still likely have performance benefits' over women."[12]

**B.** On April 15, 2020, two individuals filed a 42 U.S.C. § 1983 lawsuit seeking to invalidate the Act. ER 757-816. One of the plaintiffs, Lindsay Hecox, is a transgender woman who attends Boise State University and would like to try out for the women's cross-country and track-and-field teams. ER 6-7. Hecox has alleged that the Act violates the Fourteenth Amendment's Equal Protection Clause by discriminating on the basis of transgender status.[13] ER 799-802. Shortly after, two

---

[12] *Id.* § 33-6202(11) (citing Tommy Lundberg et al., *Muscle strength, size and composition following 12 months of gender-affirming treatment in transgender individuals: retained advantage for the transwomen*," KAROLINKSA INSTITUTET (Sept. 26, 2019)).

[13] The other plaintiff, Jane Doe, is not transgender and is challenging a different provision of the Act. ER 7. The Plaintiffs have also alleged that the Act

cisgender women who compete on Idaho State University's cross-country and track-and-field teams successfully intervened to defend the Act. ER 8, 14-29. On August 17, 2020, the district court denied the Governor's motion to dismiss and granted the Plaintiffs' motion for a preliminary injunction. ER 29-87.

After deciding to apply intermediate scrutiny to the classifications drawn by the Act, ER 56-60, the district court examined whether it promoted the interests articulated in its legislative-findings provision, ER 66-76. Stated differently, the court asked whether prohibiting transgender women from competing in women's athletics "promote[s] sex equality," "provid[es] opportunities for female athletes to demonstrate their skill, strength, and athletic abilities," and "provid[es] female athletes with opportunities to obtain recognition and accolades, college scholarships, and the numerous other long-term benefits that flow from success in athletic endeavors." Idaho Code § 33-6202(12). The district court concluded that the Act fell short of promoting these goals. ER 66-76.

Specifically, the district court found that, so long as transgender women "suppress[] their testosterone for one year" before competing, "equality in sports is *not* jeopardized by allowing" them "to compete on women's teams." ER 69 (emphasis in original). In so finding, the district court relied on a "small study" cited

---

violates the Fourteenth Amendment's Due Process Clause, the Fourth Amendment, and Title IX, ER 802-08, but those claims are not before the Court at this preliminary stage, *see* ER 3-4.

by the Plaintiffs' medical expert that, in the court's view, "show[ed] that after undergoing gender affirming intervention, which included lowering their testosterone levels," transgender "athletes' performance was reduced so that relative to cisgender women, their performance was proportionally the same as it had been relative to cisgender men prior to any medical treatment." ER 69.

After dismissing the Defendant's evidence and noting that the NCAA and the International Olympic Committee allow transgender women to compete in women's athletics after a year of testosterone suppression, ER 70, 72-73, the district court concluded that "the Act's categorical exclusion of transgender women athletes has *no relationship* to ensuring equality and opportunities for female athletes in Idaho." ER 74 (emphasis added). Instead, it construed the Act's "[a]ctual [p]urpose" as the "exclu[sion]" of "women and girls who are transgender, rather than" the promot[ion]" of "sex equality and opportunities for women." ER 77. After determining that the Plaintiffs satisfied the other criteria for a preliminary injunction, ER 83-86, the district court granted their request, ER 87. This appeal followed.

## ARGUMENT

When the district court concluded that "the Act's categorical exclusion of transgender women athletes has no relationship to ensuring equality and opportunities for female athletes in Idaho," ER 74, it did so based on its belief that one-year of testosterone suppression would alleviate any advantage a person born

with male anatomy might have over a cisgender female, *see* ER 69. The district court was mistaken. Current research is coalescing around the conclusion that athletes born with male anatomy enjoy numerous physical advantages over their cisgender female counterparts, and not all these advantages are surmountable through hormone suppression. This insurmountable advantage, in turn, means that allowing transgender women (*i.e.*, individuals born with male anatomy) to compete with cisgender women creates a safety risk and a perpetual disadvantage for cisgender women.

## I. TESTOSTERONE SUPPRESSION CANNOT ELIMINATE THE INHERENT ADVANTAGE THAT INDIVIDUALS BORN WITH MALE ANATOMY HAVE OVER CISGENDER WOMEN.

For years, the World Rugby Organization had followed the International Olympic Committee's policy for transgender participation on women's teams,[14] which, as the district court noted, allows transgender women to participate on women's teams so long as they suppress their testosterone to a certain level for at least twelve months before an athletic competition, ER 72. But in early 2020, World Rugby decided to examine its protocol to ensure that it appropriately balanced "athletic welfare, inclusion, and fairness."[15] To do so, the World Rugby

---

[14] *World Rugby to review transgender policy*, REUTERS (Feb. 28, 2020), *available at* https://www.reuters.com/article/uk-rugby-union-inclusion/world-rugby-to-review-transgender-policy-idUKKCN20M0LL.

[15] *Id.*

Organization convened a "dedicated multi-disciplinary transgender participation working group,"[16] led by Dr Araba Chintoh, a World Rugby Executive Leadership Scholarship recipient and a psychiatrist.[17]

In February 2020, the working group engaged in a two-day workshop in London. The workshop brought together a cross-section of experts from the fields of medicine, physiology, psychology, risk, socio-ethics, and sporting environment.[18] The participants also included transgender community representatives, players, doctors, researchers, and rugby experts.[19] By all accounts, the process was comprehensive, collaborative and transparent.[20] After the workshop concluded, World Rugby began a "comprehensive review of the workshop outcomes and

---

[16] *Landmark World Rugby transgender workshop important step towards appropriate rugby-specific policy*, WORLD RUGBY (Feb. 27, 2020), *available at* https://www.world.rugby/news/563437.

[17] *Rugby says transgender women should not play for elite teams*, THE ASSOCIATED PRESS (Oct. 9, 2020), *available at* https://apnews.com/article/rugby-archive-2650df82f07c43bf17234382e817db90.

[18] *World Rugby approves updated transgender participation guidelines*, WORLD RUGBY (Sept. 20, 2020), *available at* https://www.world.rugby/news/591776/world-rugby-approves-updated-transgender-participation-guidelines.

[19] *Id.*

[20] *Id.*; *see also Landmark World Rugby transgender workshop important step towards appropriate rugby-specific policy*, WORLD RUGBY (Feb. 27, 2020), *available at* https://www.world.rugby/news/563437; *Rugby says transgender women should not play for elite teams*, THE ASSOCIATED PRESS (Oct. 9, 2020), *available at* https://apnews.com/article/rugby-archive-2650df82f07c43bf17234382e817db90.

learnings to inform the development of guidelines that consider inclusivity in the context of ensuring player safety is not compromised."[21] It then began a "comprehensive and inclusive process of consultation with advocacy groups, player representatives and unions" that lasted for most of 2020.[22]

In October 2020, World Rugby released an updated version of its transgender participation guidelines, which concluded that "[t]ransgender women may not currently play women's rugby."[23] Despite World Rugby's commitment to transgender inclusion and its ongoing expenditure of resources into research regarding "the safe participation of all players in rugby,"[24] the "size, force- and power-producing advantages" that individuals born with male anatomy enjoy over cisgender female athletes translated into a "risk of injury" that "is too great" to allow transgender women to compete on cisgender women's rugby teams.[25]

---

[21] *World Rugby approves updated transgender participation guidelines*, WORLD RUGBY (Sept. 20, 2020), *available at* https://www. world.rugby/news/591776/world-rugby-approves-updated-transgender-participation-guidelines.

[22] *Id.*

[23] TRANSGENDER GUIDELINE at 2, WORLD RUGBY (Oct. 9, 2020), *available at* https://playerwelfare.worldrugby.org/?documentid=231.

[24] Sara Orchard, *World Rugby could ban transgender women because of safety reasons*, BBC SPORT (Jul. 20, 2020), *available at* https://www.bbc.com/sport/rugby-union/53476972.

[25] TRANSGENDER GUIDELINE at 2, WORLD RUGBY (Oct. 9, 2020), *available at* https://playerwelfare.worldrugby.org/?documentid=231.

According to World Rugby, individuals born with male anatomy have, relative to cisgender women, "[s]ignificant increases in total body mass[,] . . . lean/muscle mass[,] and muscle density"; "[r]eduction in body fat mass," which "improv[es] strength and power-to-weight ratio"; "[i]ncreased height," which "change[s] [the] dimensions of important levers"; "greater bone density"; "[i]ncreased haemoglobin levels"; and "[i]ncreased heart and lung size."[26] These "biological advantages," mean that individuals born with male anatomy, relative to their cisgender female counterparts, enjoy:

- "[s]ignificantly greater strength (between 50% and 60% percent by adulthood, with relatively greater upper body strength)";

- "[s]ignificant speed advantages (between 10% and 15% over various durations)";

- "[g]reater capacity to produce force/power (advantages of between 30% and 40% in explosive movement capabilities)"; and

- "[s]trength-to-weight and power-to-weight advantages (even after adjusting for mass, height, and similar level of performance (elite, untrained etc), males have 30-40% strength advantage)."[27]

Acutely relevant for purposes of this case, World Rugby considered whether "suppression of testosterone for a period of 12 months is sufficient to remove the biological differences that create performance differences."[28] According to World

---

[26] *Id.*

[27] *Id.*

[28] *Id.* at 2-3.

Rugby, "[r]esearch contradicts" the proposition that testosterone suppression can close the gap between those born with male anatomy and cisgender women.[29] For those born with male anatomy, testosterone suppression reduces "at most 5% to 10%" of a person's "total mass, muscle mass and/or strength."[30] Because physical training both "before or during the period of testosterone suppression" is expected to "attenuate the decline" in muscle mass and strength caused by testosterone suppression, "the size of the biological differences prior to testosterone suppression" and the "comparatively small effect of testosterone reduction" means "substantial and meaningful differences . . . remain."[31] In other words, "[g]iven that the typical male vs female advantage in the above-described biological variables and hence performance outcomes ranges from 30% to 100%, a substantial and meaningful advantage is retained *even after* testosterone suppression."[32]

Additional research bolsters World Rugby's conclusions. In May 2020, Emma N. Hilton and Tommy R. Lundberg circulated a preprint[33] of their paper titled "Transgender Women in The Female Category of Sport: Is the Male Performance

---

[29] *Id.* at 2.

[30] *Id.*

[31] *Id.*

[32] *Id.* at 3 (emphasis added).

[33] "A preprint is a piece of research that has not yet been peer reviewed and published in a journal. In most cases, they can be considered final drafts or working papers." PREPRINTS, https://www.preprints.org/how_it_works.

Advantage Removed by Testosterone Suppression?" The paper "review[ed] how differences in biological characteristics between biological males and females affect sporting performance and assess[ed] whether evidence exists to support the assumption that testosterone suppression in transgender women removes the male performance advantage."[34]

After canvassing the relevant research, the paper concluded that, at a minimum, (1) "sporting advantage conferred by skeletal size and bone density would be retained despite testosterone reductions,"[35] and (2) "given the large baseline differences in muscle mass between males and females . . . , the reduction achieved by 12 months of testosterone suppression can reasonably be concluded to be small relative to the initial superior mass."[36] In other words, "the muscle mass advantage males possess over females, and potentially the performance implications thereof, are not removed by 12 months of testosterone suppression."[37]

---

[34] Emma N. Hilton and Tommy R. Lundberg, *Transgender Women in The Female Category of Sport: Is the Male Performance Advantage Removed by Testosterone Suppression?* at 2, PREPRINTS 2020, *available at* https://www.preprints.org/manuscript/202005.0226/v1.

[35] *Id.* at 9.

[36] *Id.*

[37] *Id.*

## II. FOR THESE REASONS, THE DISTRICT COURT ERRED BY CONCLUDING THAT THE ACT HAS "NO RELATION" TO ENSURING EQUALITY FOR FEMALE ATHLETES.

As noted above, the district court rejected the argument that the Act "promot[es] sex equality, provid[es] opportunities for female athletes to demonstrate their skill, strength, and athletic abilities, and . . . provid[es] female athletes with opportunities to obtain college scholarship and other accolades." ER 66-76. It reached this conclusion because, in its view, "equality in sports is *not* jeopardized by allowing transgender women who have suppressed their testosterone for one year to compete on women's teams." ER 69 (emphasis in original). And in support of its conclusion, it relied on (1) the Plaintiffs' medical expert, who highlighted what was, at the time, "the only study examining the effects of gender-affirming hormone therapy on the athletic performance of transgender athletes," ER 69-70, and (2) the policy of the NCAA and the International Olympic Committee, both of which allow transgender women who had suppressed their testosterone for one year to compete on women's teams, ER 72-73.

Respectfully, the district court was mistaken. Even assuming that "'the difference in testosterone is generally the primary known driver of differences in athletic performance between elite male athletes and elite female athletes,'" ER 69, it does not follow that merely suppressing testosterone for one year will eliminate that difference. This is because (as discussed above), during puberty, the different

levels of testosterone between men and women begin to cement the disparity in muscle size, bone structure, speed, strength, and power. *See supra* at 18-20. For that reason, when those born with male anatomy and cisgender women mature into adults, the former enjoy roughly a 60% advantage in strength, a 40% advantage in power, and a 15% advantage in speed. *See supra* at 18. At most, testosterone suppression results in a 5% to 10% reduction in athletic performance. *See supra* at 19. This meager effect cannot, by virtue of pure math, close that gulf, and the district court was wrong to conclude that it does.

Despite a desire to advance inclusion for all athletes, athletic organizations around the world are being forced to grapple with the reality that transgender women have an inherent, biological advantage over cisgender women that cannot be surmounted by testosterone suppression. This is particularly true for the sports that, by virtue of their nature, raise questions of competitor safety. When asked whether testosterone suppression would reduce the risk of, among other things, head-and-neck injuries to female rugby players, the World Rugby Organization convened a working group of all interested stakeholders, examined and debated the issue for nearly a year, and ultimately concluded that "the risk of injury is too great" to allow transgender women to compete on women's rugby teams.[38]

---

[38] TRANSGENDER GUIDELINE at 2, WORLD RUGBY (Oct. 9, 2020), *available at* https://playerwelfare.worldrugby.org/?documentid=231.

The district court further erred by relying on the practices of other elite athletic governing bodies. Indeed, recent developments at the International Olympic Committee tend to bolster the argument that the Act does in fact serve the goal of female equality in sport. Although the International Olympic Committee currently allows transgender women to participate in women's events so long as they suppress their testosterone levels for a year before competition, ER 72-73, it remains enmeshed in a debate about the wisdom of that policy based on "new developments, data, research and learnings in the scientific and human rights sectors."[39] Indeed, it recently announced that it was determining whether to make its policy more stringent by requiring stricter testosterone suppression, but it has since delayed the issuance of updated guidelines until after the 2020 Tokyo Summer Games,[40] because "the discussions so far have confirmed considerable tension between the notions of fairness and inclusion, and the desire and need to protect the women's category."[41] In other words, while the district court viewed the policy of the International

---

[39] *IOC Executive Board Opens Second Meeting of the Year*, INT'L OLYMPIC COMM. (Mar. 3, 2020), *available at* https://www.olympic.org/news/ioc-executive-board-opens-second-meeting-of-the-year.

[40] *IOC to publish transgender guidelines after Tokyo Games*, ESPN OLYMPIC SPORTS (Mar. 4, 2020), *available at* https://www.espn.com/olympics /story/_/id/28835943/ioc-publish-transgender-guidelines-tokyo-games.

[41] *IOC Executive Board Opens Second Meeting of the Year*, INT'L OLYMPIC COMM. (Mar. 3, 2020), *available at* https://www.olympic.org/news/ioc-executive-board-opens-second-meeting-of-the-year.

Olympic Committee as evidence that "equality in sports is not jeopardized by allowing transgender women who have suppressed their testosterone for one year to compete on women's teams," ER 69 (emphasis omitted), the debate currently churning at the Committee shows that not everyone is as convinced that the Committee has struck the appropriate balance between fairness, inclusion, and the protection of women's athletics.

The foregoing distills into an fundamental point: Those tasked with ensuring female-athlete safety and competitive integrity are acutely aware that "equality in sports" might indeed be "jeopardized by allowing transgender women who have suppressed their testosterone for one year to compete on women's teams." ER 69. For this reason, the World Rugby Organization has now concluded that player safety compels it to limit women's teams to cisgender women. For this reason, the International Olympic Committee remains immersed in debate, with some experts on the Committee concerned by "emerging findings from the Karolinska Institute in Sweden, which show that testosterone suppression for transgender women has little effect on reducing muscle strength even after a year of treatment" and "indicates that at least some of the physical advantages of those who have gone through male puberty are maintained even after transitioning."[42] And for this reason, the district

---

[42] Sean Ingle, *IOC delays new transgender guidelines after scientists fail to agree*, THE GUARDIAN (Sept. 24, 2019), *available at* https://www.

court was wrong to conclude that the line drawn by the Idaho Legislature "has *no relationship* to ensuring equality and opportunities for female athletes in Ohio," ER 74 (emphasis added), and instead serves only to "exclude[] women and girls who are transgender," ER 77.

As discussed above, *see supra* at 19-20, scholarship is beginning to fall more in line with the Defendants' expert, who concluded that "[a]dministration of androgen inhibitors and cross-sex hormones to men, or adolescent boys, after male puberty . . . does not eliminate the performance advantage of men or adolescent boys over women or adolescent girls in almost all athletic contests." ER 424. As it has, some elite athletic governing bodies have either concluded that the risk to player safety and fairness is too great to allow transgender women to compete against cisgender women at all (*e.g.*, World Rugby) or have engaged in ongoing, as-yet-inconclusive discussions about how best to manage the risk (*e.g.*, the International Olympic Committee). Implicit in both practices is the same premise—those born with male anatomy have an inherent, biological advantage over cisgender women, and suppression of testosterone is not providing the solution.

At a minimum, the district court was wrong "to second-guess the Legislature's determination" in this dynamic, complex issue that sounds, at its core, as a matter of

---

theguardian.com/sport/2019/sep/24/ioc-delays-new-transgender-guidelines-2020-olympics.

science, ethics, and policy. *See Gallinger v. Becerra*, 898 F.3d 1012, 1020 (9th Cir. 2018). This is especially true given the implicit suggestion of untoward motives in the district court's conclusion that the "[a]ctual [p]urpose" of the Act is the "exclu[sion]" of "women and girls who are transgender, rather than on promoting sex equality and opportunities for women." ER 77. Indeed, this finding runs headlong into the "presumption of constitutionality" challenged statutes enjoy, *see Forbes v. Napolitano*, 236 F.3d 1009, 1012 (9th Cir. 2000), as well as the U.S. Supreme Court's admonition that "[j]udicial inquiries into Congressional motives are at best a hazardous matter, and when that inquiry seeks to go behind objective manifestations it becomes a dubious affair indeed," *Flemming v. Nestor*, 363 U.S. 603, 617 (1960).

## CONCLUSION

The current International Olympic Committee policy on transgender athletes states that, while "it is necessary to ensure insofar as possible that trans athletes are not excluded from the opportunity to participate in sporting competition," it emphasizes that "the overriding sporting objective is and remains the guarantee of fair competition."[43] The Amici believe, based on their own experience and the latest conclusions from the world of sports science, that Idaho's Fairness in Women's

---

[43] *Transgender Athletes Can Now Compete in Olympics Without Surgery*, THE N.Y. TIMES (Jan. 25, 2016), *available at* https://www.nytimes.com/2016/ 01/26/sports/olympics/transgender-athletes-olympics-ioc.html.

Sports Act is intended to, and does in fact, serve this objective. In other words, the Act provides the equal "opportunities for female athletes to demonstrate their skill, strength, and athletic abilities" "while also providing them with opportunities to obtain recognition and accolades, college scholarships, and the numerous other long-term benefits that flow from success in athletic endeavors." Idaho Code. § 33-6202.

"Sport is an unusual if not unique institution. It is a public space where the relevance of sex is undeniable, and where pretending that it is irrelevant . . . will cause the very harm Title IX was enacted to address."[44] These words, offered by a Duke Law School professor/former elite track athlete, an eighteen-time Grand Slam winner/member of the International Tennis Hall of Fame, and a four-time Olympic gold medal sprinter, echo the sentiments not only of the Amici but of women athletes across the Nation. While Idaho tried to advance the cause of Title IX's pioneers, the district court's preliminary injunction risks damaging that cause. Accordingly, the Amici respectfully request that this Court reverse it.

---

[44] Doriane Coleman, Martina Navratilova, and Sanya Richards-Ross, *Pass the Equality Act, but don't abandon Title IX*, WASH. POST (Apr. 29, 2019), *available at* https://www.washingtonpost.com/opinions/pass-the-equality-act-but-dont-abandon-title-ix/2019/04/29/2dae7e58-65ed-11e9-a1b6-b29b90efa879_story.html.

Respectfully submitted,

*/s/ Edward M. Wenger*
EDWARD M. WENGER
119 South Monroe Street, Suite 300
Tallahassee, Florida 32301
Telephone: (850) 222-7500
Fax: (850) 224-8551
edw@hgslaw.com

*Counsel for Amicus Curiae*

# CERTIFICATE OF COMPLIANCE

1.  This document complies with the type-volume limits of Federal Rule of Appellate Procedure 29(a)(5) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 5,767 words.

2.  This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ Edward M. Wenger
EDWARD M. WENGER
*Counsel for Amicus Curiae*

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 19, 2020, I electronically filed the foregoing Amicus Curiae Brief of Sandra Bucha, Linda Blade, Vicki Huber-Rudawsky, Inga Thompson, Maria Blower, and Rebecca Dussault in Support of the Appellants and Reversal with the Clerk of Court by using the Court's CM/ECF system, which will send a notice of electronic filing to all parties in the case who are registered through CM/ECF.

/s/ Edward M. Wenger
EDWARD M. WENGER
*Counsel for Amicus Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** Nos. 20-35813, 20-35815

I am the attorney or self-represented party.

**This brief contains** 5,767 **words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Edward M. Wenger*      **Date** November 19, 2020
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**      *Rev. 12/01/18*